**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

SHENECQUA BUTT, ALLEGRA KING,    :    CIVIL ACTION
TANYA MITCHELL, THERESA HOWARD,  :
and ELLEN BRONSON,               :
               Plaintiffs,   :
                              :
    v.                     :
                              :
UNITED BROTHERHOOD OF CARPENTERS :
& JOINERS OF AMERICA, EDWARD     :
CORYELL, and MARK DURKALEC,      :
           Defendants.      :    NO. 09-4285
                              :

**MEMORANDUM RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**Baylson, J.**                                    **January 26, 2012**

I.    **Introduction**

    Plaintiffs Shenecqua Butt ("Butt"), Allegra King ("King"), Tanya Mitchell ("Mitchell"),

Theresa Howard ("Howard"), and Ellen Bronson ("Bronson") are African-American female

carpenters.  Defendants Metropolitan Regional Council of Carpenters, Southeastern

Pennsylvania, State of Delaware and Eastern Shore of Maryland, United Brotherhood of

Carpenters & Joiners of America ("the Union"), Edward Coryell ("Coryell"), and Mark Durkalec

("Durkalec") are Plaintiffs' labor union and union representatives.  Plaintiffs allege that

Defendants have engaged in race and sex discrimination under Title VII of the Civil Rights Act

of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., race discrimination under 42 U.S.C. § 1981, and

retaliation under Title VII and § 1981.[1]  Plaintiff Bronson is also suing for race and sex

---

[1] Except for Plaintiff Bronson, who does not allege retaliation.  Pl. Exh. C.

discrimination under the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951 et seq.

The substantive thrust of their allegations is that Plaintiffs have received substantially fewer job

assignments than male and white carpenters due to the discriminatory and retaliatory behavior of

Defendants.

Defendants have moved for summary judgment on all claims pursuant to Fed. R. Civ. P.

56.  For the following reasons, Defendants' Motion is GRANTED.

## II.   **Factual Background**

The following facts are undisputed[2] or reflect Plaintiffs' version of the facts in the record,

pursuant to this Court's duty to view all facts and inferences in the light most favorable to the

non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

### A.   **Overview of Union**

Plaintiffs are members of Local 1073 of the Union.  Pl. SUF ¶¶ 20, 54, 83, 95, 112.

Upon entry into the Union, all Plaintiffs were assigned Durkalec as their business agent.  Id. ¶¶

24, 56, 85, 96, 116.  Durkalec, a white male, is the Business Representative responsible for

coordinating residential construction work for the Union membership.  Def. SUF ¶ 6.  The other

individual Defendant in this case, Coryell, serves as the Executive-Treasurer and Business

Manager of the Union.  Id. ¶ 2.

The Union takes a number of measures to assist members in obtaining job assignments

with signatory contractors, though members are not prohibited from obtaining employment with

---

[2] The parties each submitted statements of material undisputed facts ("Pl. SUF" and "Def. SUF") for purposes of this Motion and responded to their opponent's statements of material undisputed facts.  Statements which an opposing party "disputed" were deemed undisputed for purposes of this Motion if the party's explanation of the dispute was non-responsive or failed to reference supporting evidence in the record.  See Fed. R. Civ. P. 56(c), (e).

other employers.  Signatory contractors are employers who have signed agreements with the Union to solicit labor through a specified process and to make certain contributions toward Union members' health and other benefits.  Pl. Exh. I at 8-9, 12, 43.

For example, to assist its members in obtaining job assignments, the Union publishes and mails a quarterly newsletter to all members containing a list of construction projects in the area.  Def. SUF ¶ 20.  Members are encouraged to visit these worksites, as well as to solicit new opportunities on their own.  Id. ¶¶ 18, 20.  Any employer is free to hire any member of the Union, as long as the member is in good standing.  Id. ¶ 22.

The Union also employs Business Representatives, like Durkalec, to help members find work.  Specifically, Business Representatives have the authority to contact job sites about the availability of jobs, to communicate any opportunities to members, and to refer members to signatory contractors who call looking for labor.  Id. ¶ 25-26, 31.  In addition, Business Representatives receive "job start" documents notifying them of upcoming construction projects from signatory contractors.  Id. ¶ 27.  Although the Union assists members with employment prospects, it does not guarantee them continued employment.  Id. ¶ 36.

### B.    Plaintiffs' Difficulties Finding Work

The undisputed facts reflect that for the last several years, Plaintiffs have had some difficulty in finding work or received work assignments that they considered to be unfavorable.  For example, Butt and Mitchell experienced significant periods of unemployment, including from February 2007 though March 2008.  Pl. SUF ¶¶ 30, 63.  Bronson experienced a 3-month period of unemployment in 2005, Def. SUF ¶ 84, Howard struggled to find work in 2005 and 2006, Pl. SUF ¶ 113-14, and King's annual work hours in 2008 dropped to 432.50 hours, which

was 925.25 hours fewer than the year before, Pl. Exh. F.[3]

Plaintiffs' difficulties with employment are corroborated not only by their own testimony, but also by the testimony of Defendants. For example, Defendant Coryell stated in his affirmation that he was aware Plaintiffs Butt and Mitchell were having difficulty obtaining work. Def. Ex. 1 at ¶¶ 57, 62-63. Defendant Durkalec affirmed the same. Def. Exh. 2 at ¶ 23.

Plaintiffs' deposition testimony indicates that they had trouble obtaining work assignments even when there were specific openings available on job sites. Butt, for instance, visited one job site where work was available. Pl. Exh. H. at 52:3-55:6. She subsequently contacted Defendant Durkalec and requested to be referred to the job; nevertheless, she was not ultimately hired for the position. Id.

Finally, according to Plaintiffs, their troubles were not limited to obtaining assignments in the first place—even when they did get work, they were assigned to less desirable jobs in less desirable neighborhoods, such as jobs at nuclear plants. Pl. Exh. N. at 88:5-23.

### C.    The Alleged Discrimination Against Plaintiffs

Plaintiffs have offered no direct evidence of race or sex discrimination by Defendants. Rather, to support their claims of discrimination, they rely on indirect and circumstantial evidence that they argue is sufficient to get their claims before a jury.

In support of their race discrimination claim, Plaintiffs offer testimony that when Plaintiff Bronson told Durkalec she was having trouble finding work, he responded: "Ellen, my people are still out of work." Pl. Exh. L at 29:1-11. Bronson further testified that she took this reference to

---

[3] Defendants submitted their own, different set of statistics regarding the average annual hours worked by Union members from 2003 to 2008. See Def. Exh. 12-14. However, on January 11, 2012, Defendants submitted a letter to the Court agreeing to the use of Plaintiffs' statistics for purposes of the Court's adjudication of the Motion for Summary Judgment. Accordingly, the Court treats Plaintiffs' statistics as undisputed for purposes of the Motion.

"my people" to mean she "was not a white man and those were the ones that was [sic] his

people." Id. at 30:1-6.  Plaintiffs also offered testimony from Plaintiff King that she had not

observed any African-American women carpenters at job sites she visited.  Pl. Exh. N. at 89:4-

24.  Finally, Plaintiffs offered evidence that both Coryell and Durkalec had reported to Plaintiffs

that signatory contractors did not want to hire black females.  Pl. Exh. E at 252:10-14; Pl. Exh. J

at 47:11-15.

Plaintiffs' evidence regarding sex discrimination is somewhat more extensive.  First,

Plaintiffs cite to the same portions of the record described above in support of their sex

discrimination claim, because that evidence involves Plaintiffs' gender as much as their race.

Second, Plaintiffs point to additional circumstantial evidence, including (1) testimony by Butt

that she was offered a job by Durkalec that he described to her as "a job that the men don't

want," Pl. Exh. E. 205:22-25; and (2) testimony by non-party Margarita Padin, a female Union

member from 1989 to 2011, reflecting her observations that the job sites were mostly male and

that female carpenters generally were given fewer job assignments, fewer hours to work, and less

desirable types of assignments, Pl. Exh R; Pl. Exh. S.

Furthermore, and most notably, Plaintiffs introduced statistics reflecting a substantial

discrepancy in average hours worked by male and female Union members during the years 2003

through 2008.  Pl. Exh. F.  The statistics reflect that, on average, male members worked for

signatory contractors 294.79 average annual hours more than female members between 2003 and

2008.  Id.  Furthermore, though the difference between male and female members' average hours

varied from year to year, in no year did the female members' average hours meet or exceed the

average hours worked by the male members.  Id.  Plaintiffs rely heavily on these statistics in their

response brief to Defendants' Motion to substantiate their claims of sex discrimination.

**D.      The Alleged Retaliation Against Plaintiffs**

All four of the Plaintiffs alleging retaliation (Butt, Mitchell, Howard, and King, i.e., "the Retaliation Plaintiffs") filed charges of discrimination against the Union with the EEOC in June or July of 2008. Pl. Exhs. G, K, O, and Q. In addition, some of the Plaintiffs complained about discrimination on other occasions. Sometime in 2006, Howard complained to Durkalec that she believed she was being discriminated against by the Union and by one of the contractors. Pl. Exh. P at 64:17-27; 65:1-11; 67:7-16. In 2008 and possibly also in 2006 and/or 2007, Butt and Mitchell complained multiple times to Defendants Coryell and Durkalec about discrimination in the assignment of jobs. Pl. Exh. H at 7:1-18; Pl. Exh. I 32:1-24; 33:1-3; Pl. Exh. J 87:1-15. Finally, in 2008, Butt and Mitchell testified publicly before the Mayor's Commission on Diversity that they were experiencing discrimination at work. Pl. Exh. E 90:1-11; Pl. Revised SUF ¶ 71.

The record reflects that after the Retaliation Plaintiffs made their complaints, they continued to have difficulty finding jobs and to receive unfavorable assignments. In 2008, all of them worked fewer hours than the average Union member, male or female. Pl. Exh. F. Plaintiffs emphasize that King's hours, in particular, were "drastically reduced" from 2007 to 2008. Pl. Br. at 47.

**III.    Procedural History in this Court and the Undisputed Facts Submitted by Plaintiffs' Counsel to the Court**

On November 5, 2009, Butt, Mitchell, and King filed an Amended Complaint asserting claims of race and sex discrimination and unlawful retaliation against Defendants, in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. (ECF No. 6) On June 2, 2010,

6

a Complaint was filed by Howard asserting identical claims against Defendants; accordingly, the matters were consolidated pursuant to an Order of August 19, 2010.  (ECF No. 24)  On July 6, 2010, a Complaint was filed by Bronson asserting nearly identical claims against Defendants, except Bronson did not make allegations of unlawful retaliation; furthermore, she invoked the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. § 951 et seq., as an additional legal basis for her race and sex discrimination claims.  On May 25, 2011, Bronson's action was consolidated with the actions by Butt, Mitchell, King, and Howard.  (ECF No. 38).

The Court held oral argument regarding Defendants' Motion on December 19, 2011.  See Audio File 12/19/11 (ECF No. 49).  At that hearing, the Court provided Plaintiffs' counsel, Jeremy Cerutti, Esq., with the opportunity to marshal Plaintiffs' best evidence in support of their various claims.  The Court then questioned Plaintiffs' counsel regarding a number of incorrect citations to the record or other improper or mistaken assertions contained within Plaintiffs' Statement of Undisputed Facts and the accompanying brief.  For example, the Statement arguably most damaging to Defendants and the only "direct evidence" of a discriminatory animus—namely, that Defendant Coryell "stated that if the female union members rolled off of their men and put their babies down, they could go to work," Pl. SUF ¶ 35; Pl. Br. at 30—was hearsay that Plaintiffs had not supported with admissible evidence, as required by Federal Rule of Civil Procedure 56(c).

Similarly, another potentially damaging Statement with respect to the sex discrimination claim—i.e., that "[e]very time Mr. Durkalec receives a call and provides the name of a female carpenter, the contractor says 'next' and Mr. Durkalec simply provides the next male carpenter's name," Pl. SUF ¶ 9 (emphasis added)—was unsupported by the relevant record evidence, which

reflected only that Mr. Durkalec would provide the next carpenter's name on the list, regardless of gender.  Pl. Exh. I at 16:3-22.

The Court advised Plaintiffs' counsel that, in its current form, Plaintiffs' Statement of Undisputed Facts and accompanying brief might be insufficient to allow Plaintiffs to withstand summary judgment, and, in any event, Plaintiffs' papers were unhelpful to the Court insofar as they contained inaccurate descriptions of record evidence.  Accordingly, Plaintiff was invited to submit a Revised Statement of Undisputed Facts, limited to admissible evidence and containing proper citations, that might better support Plaintiffs' claims.  At the hearing and in a subsequent written Order, Plaintiffs were directed to submit this filing by December 30, 2011, and Defendants were ordered to respond by January 7, 2012.  (ECF No. 48).

Plaintiffs and Defendants timely submitted their supplemental filings.  (ECF Nos. 51, 53). Among other modifications, Plaintiffs withdrew the Statement that Coryell had said women carpenters should "roll[ ] off of their men and put their babies down [so that] they could go to work."  Plaintiffs also modified their SUF ¶ 9 by deleting the suggestion that Durkalec would provide only the next male carpenter's name on the list.  Nevertheless, despite the Court's unambiguous warnings to Plaintiffs' counsel and its decision to allow him time to revise any inaccurate or misleading representations to the Court, the Revised Statement of Undisputed Facts presently before the Court <u>still</u> contains mischaracterizations of the record.  For example, at ¶ 34, Plaintiffs set forth as an Undisputed Fact that "[i]n addition to being passed over for assignments, Ms. Butt was subjected to discriminatory comments made by Defendants Durkalec and Coryell." This allegation that Defendants made discriminatory comments, albeit non-specific, goes to the heart of Plaintiffs' claims and is therefore—at least at first blush—seemingly important to the

determination of summary judgment; however, an examination of the deposition testimony cited in support of this allegation shows only that one Defendant, Durkalec, told Plaintiff Butt that he had heard third-party <u>contractors</u> say they did not want to hire women. Pl. Exh. E at 176:1-12, 180:19-25. The testimony does not reflect that Durkalec himself said anything discriminatory, and it does not mention Coryell at all. This is precisely the sort of "mistaken" representation of the record that Plaintiffs' counsel was directly instructed to correct. Similar "mistakes" can be found at ¶¶ 51, 81, and 98 of the Revised Statement, among others.

Through its own independent and diligent efforts, the Court has ascertained which of Plaintiffs' remaining assertions are supported by at least some record evidence. As will be discussed in more detail below, Plaintiffs' facts fall roughly into four categories. First, Plaintiffs introduce certain facts about the actions of signatory contractors. For example, ¶¶ 36 and 73 of the Revised SUF and the corresponding portions of the record reflect that signatory contractors did not want to hire female carpenters. Second, Plaintiffs introduce evidence of stray comments of an ambiguous but potentially discriminatory character. Specifically, Plaintiffs introduced evidence that, in response to Bronson's complaints about difficulties finding work, Durkalec said, "Ellen, my people are still out of work." Revised SUF ¶ 86. Third, Plaintiffs introduce statistics, undisputed for the purposes of this Motion, reflecting their average annual hours worked between 2003 and 2008, as well as the hours of other male and female Union members. Pl. Exh. F; <u>see also, e.g.,</u> Revised SUF ¶¶ 33, 46-47, 67-68, 77 (assertions based on these statistics). The statistics are not supported by an accompanying expert or fact witness affidavit. Lastly, Plaintiffs introduce testimony reflecting suspicions or beliefs that they were being discriminated against. For instance, Plaintiffs' assert that Howard concluded she was being

9

discriminated against because she was having difficulty obtaining work and was once replaced on a job site by a white male carpenter.  Revised SUF ¶¶ 114-15.

The Court turns now to the merits of Defendants' Motion.

## IV.   **Legal Standard**

A district court should grant a motion for summary judgment if the movant can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[4]  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it "might affect the outcome of the suit under the governing law."  Id.

Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by showing the district court that "there is an absence of evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  The party opposing summary judgment must rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Id. at 322.  The district court may grant summary judgment "[i]f the evidence is merely colorable, or is not significantly probative."

---

[4] Because this civil action was pending when the Amendments to the Federal Rules of Civil Procedure became effective on December 1, 2010, the Court references the amended summary judgment standard in Fed. R. Civ. P. 56(a), which substitutes "genuine dispute" for "genuine issue," the phrase in former subdivision (c).  The Rules Advisory Committee explained that the 2010 Amendments do not affect the substantive standard for summary judgment or the applicability of prior decisions construing the standard.  Fed. R. Civ. P. 56 Advisory Committee's Note.  Pursuant to 28 U.S.C. § 2074(a) and the April 28, 2010 Supreme Court order, the amended rule governs all proceedings commenced on or after December 1, 2010, and all proceedings then pending, "insofar as just and practicable."  United States Courts, Rules and Forms in Effect: Rules and Forms Amendments Effective 12/1/10, http://www.uscourts.gov/RulesAndPolicies/FederalRulemaking/Overview/RulesForms120110.aspx (last visited Apr. 5, 2011).

Anderson, 477 U.S. at 249 (internal citations omitted).  Under Rule 56, the Court must view the evidence in the light most favorable to the non-moving party and draw all justifiable inferences in favor of the non-movant.  Id. at 255 (citing Adickes v. S. H. Kress & Co., 398 U.S. 144, 158-59 (1970)).

## V.    Discussion

### A.    Race and Sex Discrimination

Plaintiffs assert race and sex discrimination claims pursuant to the "labor organization" provision of Title VII[5] and the parallel grounds for liability under § 1981 and the PHRA.  The "labor organization" provision provides as follows:

> It shall be an unlawful employment practice for a labor organization—
> (1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;
> (2) . . . to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex, or national origin[.]

42 U.S.C. § 2000e-2(c)(2).

Under Title VII and the parallel grounds for liability in § 1981 and the PHRA, Plaintiffs must come forward with enough evidence to establish a prima facie case of discrimination against their labor organization.  See McDonnell Douglas Corp. v. Green, 411 U.S.  792, 802 (1973); Anderson v. Wachovia Mort. Corp., 621 F.3d 261, 267-68 (3d Cir. 2010) (applying

---

[5] At oral argument on December 19, 2011, Plaintiffs clarified that, notwithstanding certain allusions in their initial filings, they are pursuing their discrimination claims only under the "labor organization" provision of Title VII, 42 U.S.C. § 2000e-2(c)(2), and not the "employer" provision, 42 U.S.C. § 2000e-2(a)(1).  See Audio File 12/19/11 at 1:00-1:30 (ECF No. 49).

McDonnell Douglas framework to a claim of discrimination under § 1981); Scheidemantle v.
Slippery Rock Univ. State, 470 F.3d 535, 539 (3d Cir. 2006) (applying McDonnell Douglas
framework to a claim of discrimination under the PHRA).  If Plaintiffs succeed in establishing
their prima facie case, the burden shifts back to the labor organization to establish a legitimate,
non-discriminatory reason for its actions.  Atkinson v. LaFayette College, 460 F.3d 447, 454 (3d
Cir. 2006).  Upon the labor organization's satisfaction of this standard, the burden shifts again to
Plaintiffs to prove that the non-discriminatory explanation is merely a pretext for discrimination.
Id.

        To set out a prima facie case of discrimination, Plaintiffs must show that: (1) they are
members of a protected class; (2) they were qualified for their positions; (3) they suffered an
adverse employment action; and (4) similarly situated individuals not of the protected class
received more favorable treatment or the circumstances of the adverse employment action
otherwise give rise to an inference of unlawful discrimination.  McDonnell Douglas Corp., 411
U.S. at 802.

        Defendants argue, inter alia, that Plaintiffs fail to satisfy the third and fourth requirements
of a prima facie case for race and sex discrimination.  Specifically, Defendants claim that
Plaintiffs have failed to introduce any evidence that Defendants—as opposed to the actual
employers who received referrals of carpenters' names from Defendants—initiated or otherwise
caused any adverse employment actions against Plaintiffs.  Defendants also argue that Plaintiffs
have not shown that Defendants treated non-African-American or male carpenters more
favorably than Plaintiffs, or that there are any other grounds for an inference of unlawful
discrimination

### 1.    Sex Discrimination

Because Plaintiffs' sex discrimination claim is their strongest claim, the Court will

address it first.  With respect to that claim, Plaintiffs' principal evidence of adverse employment

action(s) is a set of statistics reflecting that their work hours with signatory contractors were

lower in some years than Union averages, especially male averages.  Pl. Exh. F.  Although the

Court is sympathetic to the fact that "proving a negative"—that is, a failure to hire, as compared

to a termination or demotion—is inherently difficult, the statistics are questionable on their face,

as they do not account for leaves of absence, pregnancy, injury, or similar confounding variables

(either with respect to Plaintiffs' hours or those of other members).  See, e.g., Def. Exh. 7 at

33:1-7, 37-40 (Plaintiff King's testimony that she took a 2-month leave of absence in 2006 and a

much longer absence due to an on-the-job injury beginning in 2007); Pl. Exh. L at 36-37

(Plaintiff Bronson's testimony that she took several months off work in 2007 and 2008 because

of a pregnancy and related health issues).  Moreover, the statistics are not supported or explained

by an expert or fact witness affidavit.

Even assuming, however, that the statistics reliably reflect any "unexplained"

discrepancies in work assignments, Plaintiffs' work hours were not always lower than Union

averages.  For example, King's total hours for 2004, 2005, 2006, and 2007 exceeded the average

annual hours worked by both female and male Union members in those years.  Pl. Exh. F.

Similarly, Bronson exceeded the average female and male averages in 2006, Butt in 2004, 2005,

and 2006, Howard in 2005 and 2006, and Mitchell in 2004, 2005, and 2006.  Id.  In sum, for the

period between 2003 and 2008, no Plaintiff failed to experience at least one year in which her

work hours exceeded the female and male averages, and one Plaintiff exceeded the averages in

the majority of years.

That said, the statistics unambiguously demonstrate that, overall, male average annual hours worked substantially exceeded female average annual hours worked between 2003 and 2008. They also demonstrate, in particular, that Plaintiffs' hours were lower in at least some years than the averages of the male Union members. Finally, the statistics are somewhat corroborated by testimony in the record tending to show that Plaintiffs struggled at various times to secure employment or were assigned to undesirable types of jobs. See, e.g., Def. Ex. 1 at ¶¶ 57, 62-63; Def. Exh. 2 at ¶ 23. Thus, Plaintiffs might have enough evidence to satisfy the third requirement of their prima facie case, if only they could establish some causal nexus between Defendants' conduct and the "adverse employment actions" (i.e., the decisions not to hire them for jobs, which resulted in periods of relatively low average hours). See Vernon v. A & L Motors, 381 Fed. App'x 164, 167-68 (3d Cir. 2010) (holding that a plaintiff's prima facie case of sex discrimination failed where the asserted adverse employment action was not one caused by the allegedly discriminatory individuals).

This they fail to do. In the briefs and at oral argument on December 19, 2011, Plaintiffs' counsel discussed at length these statistics, which reflect periods of low hours worked for signatory contractors, as well as corroborating evidence that signatory contractors did not want to hire black females. See Pl. Exh. E at 252:10-14; Pl. Exh. J at 47:11-15; Pl. Exh. N. at 89:4-24; see also Audio File 12/19/11 at 10:30-11:30 (ECF No. 49). But the record contains only unsubstantiated suspicions that the Union, Durkalec, or Coryell—that is, the defendants in this action—ever "classif[ied] or fail[ed] or refuse[d] to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or

14

would limit such opportunities or otherwise adversely affect his status as an employee or as an applicant for employment[.]"  42 U.S.C. § 2000e-2(c)(2).  Rather, the undisputed evidence reflects that Defendants consistently referred Plaintiffs to employers seeking carpenters, see, e.g., Pl. Exh. I at 21:12-21, notified Plaintiffs of construction projects in their area, Def. SUF ¶ 20, and advised them about how to become more marketable to employers in what was a difficult period for the construction industry as a whole, Def. SUF ¶ 59.  See also Def. SUF ¶¶ 35, 38 (undisputed statements that the "hours for residential construction have decreased significantly over the years, particularly in 2007" and that "both male and female [carpenters] have expressed to Durkalec that they have experienced difficulty in finding work").

Sometimes Defendants' efforts on behalf of Plaintiffs were successful, sometimes not—indeed, sometimes the only jobs available to Plaintiffs were "job[s] a lot of guys didn't want," Pl. Exh. E. at 204:8—but there is no evidence Defendants took any actions whatsoever that detrimentally affected Plaintiffs' membership status or likelihood of being hired (or fired) by a signatory contractor.  What is more, there is at least some uncontradicted evidence in the record that Defendants pushed back against what they perceived to be unfair hiring preferences by employers.  See, e.g., Pl. Exh. I at 16:21-23 (testimony of Durkalec that when contractors would pass over a female carpenter's name, he would say, "I have some good female carpenters out of work.  Can you just give this carpenter a try[?]").  In light of this record, Plaintiffs' complaints of discrimination are not without some force, but Plaintiffs seem to be pursuing the wrong defendants: their dispute is with their discriminatory employers, not the Union.  It would belie legal precedent as well as common sense for the Court to permit an adverse employment decision by a third party to suffice to establish a prima facie case of discrimination against Defendants

15

under circumstances in which Plaintiffs have not adequately demonstrated a causal nexus between Defendant's conduct and the adverse action.

The inadequacy of Plaintiffs' sex discrimination claim might also, or perhaps alternatively, be conceptualized as a failure to establish the fourth component of their prima facie case—namely, that Defendants treated men more favorably or that there is otherwise grounds for an inference of discrimination.  See McDonnell Douglas Corp., 411 U.S. at 802.  Again, Plaintiffs simply did not introduce enough evidence to proceed to a jury.  Plaintiffs assert that one of the most damaging pieces of evidence supporting an inference of discrimination is Bronson's testimony that Durkalec responded to her complaints about unemployment by saying, "My people are still out of work."  Pl. Exh. L at 29:1-11.  Bronson interpreted this statement to mean that Durkalec identified more with the plight of white males like himself than with the problems of the black females for whom he also served as business agent (though she admits she did not ask him to explain what he meant by the statement).  Id. at 29:12-24.  At oral argument, Plaintiffs emphasized the weight and importance of this testimony.  See Audio File 12/19/11 at 9:30-10:00 (ECF No. 49).

Nevertheless, construing this statement in the light most favorable to Plaintiffs—that is, construing it as Bronson did—this statement is not enough, in view of the record as a whole, to move Plaintiffs over the threshold required to survive summary judgment.  This statement is in the nature of a "stray remark" that, without more, is inadequate to give rise to an inference of discrimination.  The content of the remark, though seemingly inappropriate, reveals merely that Durkalec did not personally identify with black female carpenters.  But more importantly, the remark undermines the very idea, propounded by Plaintiffs, that white male carpenters were

16

disproportionately getting job assignments, or that Durkalec had the power to get "his people" hired.  See Ryder v. Westinghouse Elec. Corp., 128 F.3d 128, 133 (3d Cir. 1997) (describing the "purpose and content of the statement" as one factor to consider in determining whether stray remarks are probative of discrimination).  Thus, the remark is as supportive of Defendants' contentions as it is of Plaintiffs.'

In sum, none of the five Plaintiffs have established the third and fourth prongs of their prima facie case of sex discrimination, and Defendants are entitled to judgment as a matter of law.

### 2.    Race Discrimination

The Court turns now to Plaintiffs' race discrimination claim.  This claim requires less discussion, because the analysis under McDonnell Douglas is essentially identical and the claim is factually weaker than the sex discrimination claim.  Indeed, at oral argument, Plaintiffs' counsel expressly conceded as much.  See Audio File 12/19/11 at 10:00-10:30 (ECF No. 49).  According to counsel, the claim is supported principally by Durkalec's "my people" remark, as well as by the portions of the record reflecting that signatory contractors do not want to hire black females.  Id. at 9:15-11:30 (ECF No. 49).

In the circumstances presented here and for the same reasons discussed with respect to Plaintiffs' sex discrimination claim, the stray comments by Durkalec and the evidence of prejudice by third parties are inadequate to establish a prima facie case of race discrimination against Defendants.  This is especially so in light of the fact that the statistics submitted by Plaintiffs about average annual hours worked for contractors do not reflect the race of the workers, only their gender.  See Pl. Exh. F.  Accordingly, Plaintiffs cannot rely at all on these

statistics to help substantiate their assertions that they received fewer job assignments than white carpenters (nor even to show that black carpenters, as a group, received fewer job assignments than white carpenters). They are left with exceedingly little to support the inference that they suffered an adverse employment action on account of their race; certainly not enough to allow their claim against these Defendants to proceed to a jury. Here, too, after giving Plaintiffs every opportunity to marshal the facts in their favor, the Court must conclude that Defendants are entitled to judgment as a matter of law.

### B.    Retaliation

As with a claim of discrimination under Title VII or § 1981, a plaintiff bears the initial burden of establishing a prima facie case of unlawful retaliation. See McKenna v. City of Philadelphia, 649 F.3d 171, 178 n.7 (3d Cir. 2011). In particular, a plaintiff must show that: (1) he was engaged in a protected activity; (2) he suffered an adverse employment action after or contemporaneous with his protected activity; and (3) there is a causal link between his protected activity and the adverse employment action. Marra v. Phila. Hous. Auth., 497 F.3d 286, 300 (3d Cir. 2007).

The undisputed evidence reflects that all four of the Retaliation Plaintiffs filed charges of discrimination against the Union with the EEOC in June or July of 2008. Pl. Exhs. G, K, O, and Q. In addition, Howard complained to Durkalec in 2006 that she believed she was being discriminated against; Butt and Mitchell complained about discrimination to Durkalec and Coryell in 2008 and possibly also in 2006 and/or 2007; and Butt and Mitchell testified before the Mayer's Commission in 2008 that they were experiencing discrimination at work. See Pl. Exh. P at 64:17-27; 65:1-11; 67:7-16; Pl. Exh. H at 7:1-18; Pl. Exh. I 32:1-24; 33:1-3; Pl. Exh. J 87:1-

15; Pl. Exh. E 90:1-11; Pl. Revised SUF ¶ 71.  Thus, Plaintiffs have adequately demonstrated that they engaged in protected activity, as required to establish the first element of their <u>prima facie</u> case.

Plaintiffs assert that they can also make out the second and third elements of their <u>prima facie</u> case based on their statistics of annual average hours worked.  The statistics show noticeable and in some cases dramatic declines in hours worked by Plaintiffs from 2006 to 2008.  Pl. Exh. F.  According to Plaintiffs, these statistics demonstrate (1) that they suffered adverse employment consequences, and (2) that the temporal proximity between those consequences and their various complaints is of a nature adequate to establish causal link.  Plaintiffs further support their retaliation claim with evidence that, after hearing about Butt and Mitchell's testimony at the Mayor's Commission, Durkalec asked a signatory contractor[6] to put into writing an explanation of the reasons the contractor had laid them off.  Durkalec then provided the letter to a newspaper reporter writing about the Mayor's Commission because Durkalec believed Plaintiffs had lied in part of their testimony to the Commission.  Pl. Exh. I at 48:1-10; Def. Exh. 2 at ¶ 41, 44.

In their Motion, Defendants contend that they are merely Plaintiffs' collective bargaining representatives and, as such, did not cause any of Plaintiffs' adverse employment consequences.  According to Defendants, no reasonable jury could conclude that they engaged in any adverse conduct towards Plaintiffs, much less that they did so in retaliation for complaints of discrimination.

The Court agrees with Defendants.  As explained earlier in this opinion, Plaintiffs have

---

[6] Plaintiffs' Revised Statement of Undisputed Facts incorrectly states that Durkalec asked a "Union Official" to write this letter, <u>see</u> Revised SUF ¶ 51; in fact, the record reflects that a <u>signatory contractor</u> was asked to explain the <u>signatory contractor's decision</u> to let go of Butt and Mitchell.  Def. Exh. 2 at ¶ 41; Pl. Exh. I at 45:19-23, 48:1-10.

not introduced evidence tending to show that the putative adverse employment actions were taken or even influenced by Defendants.  The statistics submitted by Plaintiffs show that Plaintiffs experienced certain periods in which they worked relatively few hours for signatory contractors.  But beyond those facts and Plaintiffs' unsubstantiated suspicions, the record demonstrates only that Defendants took efforts to help Plaintiffs obtain employment.  See, e.g., Pl. Exh. I at 21:12-21; Def. SUF ¶¶ 20, 59.  Plaintiffs have cited no bona fide evidence in their briefs or at oral argument tending to show that Defendants refused to refer Plaintiffs' names to employers, bad-mouthed them to prospective employers, declined to provide them with the usual newsletters and notices of upcoming construction projects, or similarly thwarted their job prospects.

Nor is the Court persuaded by Plaintiffs' reliance on Durkalec's actions after the Mayor's Commission.  Durkalec's submission to a reporter of a letter written by a contractor does not rise to the level of an "adverse employment action" against Butt and Mitchell, even assuming arguendo that the letter did not reflect favorably on them.  See, e.g., Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761 (1998) (defining an adverse employment action as "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits").  The Court concludes that Plaintiffs have failed to make out the second element of their prima facie case of retaliation.

The Court turns briefly to Plaintiffs' obligation to establish a causal link between their complaints of discrimination and any adverse actions.  The Court notes that the employment data upon which Plaintiffs principally rely demonstrates only that Plaintiffs' work hours declined

during the same general period of 3 years in which Plaintiffs lodged their complaints. This time

period, moreover, coincided with a severe economic recession as well as injury and pregnancy-

related leaves of absence taken by some of the Plaintiffs. Def. Exh. 7 at 33:1-7, 37-40; Pl. Exh. L

at 36-37. Even assuming <u>arguendo</u> that Defendants had decision-making authority regarding

employers' hiring of Plaintiffs, the Court is skeptical that, under existing Third Circuit precedent,

the nature of this particular data would suffice to establish an "unusually suggestive" temporal

proximity or other basis for causal link. <u>Lauren W. ex rel. Jean W. v. DeFlaminis</u>, 480 F.3d 259,

267 (3d Cir. 2007). However, in light of the Court's holding that Plaintiffs failed to establish the

second element of their <u>prima facie</u> case of retaliation, the Court declines to reach the more

difficult question of causal link.

## VI.    Conclusion

      For the reasons set forth above, Defendants' Motion for Summary Judgment is

GRANTED with respect to all of Plaintiffs' claims.

      An appropriate Order follows.

O:\CIVIL 09-10\09-4285 Butt v. United Brotherhood\Butts SJ Memo.wpd